**CARL W. SULLIVAN**
521 Ponderosa Drive
Bel Air, MD  21014

and

**DOROTHY SULLIVAN**
521 Ponderosa Drive
Bel Air, MD  21014

     Plaintiffs

v.

**CATHOLIC HEALTH INITIATIVES, INC.**
198 Inverness Dr. West
Englewood, CO 80112

    <u>Serve on:</u>
The Corporation Trust Incorporated
351 West Camden Street
Baltimore, Maryland  21201

    Defendant

|

**IN THE**

|

**CIRCUIT COURT**

|

**FOR**

|

**BALTIMORE COUNTY**

03-C-13-4045

Case No.: _____

RECEIVED AND FILED
2013 APR 11  P 2:33
CLERK OF CIRCUIT COURT
BALTIMORE COUNTY

---

### COMPLAINT

    Now comes the Plaintiffs, Carl Sullivan (hereinafter Carl Sullivan or Plaintiff) and Dorothy Sullivan (collectively hereinafter Mr. and Mrs. Sullivan or Plaintiffs), by and through their attorneys Howard A. Janet, Giles H. Manley, Joyce E. Jones, William Burnham, Tara J. Posner, and Janet, Jenner & Suggs, LLC, hereby seeks compensatory and  punitive damages, plus costs, against Defendant Catholic Health Initiatives, Inc. ("hereinafter CHI") and for their causes of action state:

### I.    <u>ALLEGATIONS COMMON TO ALL COUNTS</u>

### <u>INTRODUCTION</u>

    1.    At all times relevant hereto, Catholic Health Initiatives, INC. (CHI) operated St. Joseph Medical Center, Inc. (SJMC) in Towson, Maryland.  CHI employees and actual and/or

apparent agents served in the highest echelons of SJMC and ran the hospital. CHI employees served in key leadership roles at SJMC, including but not limited to, SJMC's CEO, officers, directors, and other corporate governance and managerial positions. These people, acting at all times within the scope of their employment with CHI, oversaw SJMC's operations and made day-to-day operating decisions, including without limitation, hiring of physicians, risk management, expansion of facilities, approval of contracts, corporate governance, and sitting on the Board of SJMC. They were charged with non-delegable duties to provide safe, appropriate, and quality care to its patients.

2.      The causes of action set forth herein emanate from CHI's abrogation of their duties at SJMC such that on July 21, 2005, Plaintiff Carl Sullivan suffered risky, inappropriate, and unnecessary medical care in the form of cardiac catheterization, angioplasty, and cardiovascular stent placement procedures performed at St. Joseph Medical Center, Inc., directly and/or through CHI's actual and/or apparent officers, directors, agents, servants, and/or employees. These unnecessary invasive procedures were contraindicated and undertaken in violation of applicable medical standards of care.

3.      This case, however, involves more than mere negligence. CHI, who at all times relevant hereto, acted directly and/or through its actual and apparent employees, agents, servants, officers, and directors (collectively hereinafter "CHI's agents") , resorted to fraud in order to induce Plaintiff to consent to the stent, angioplasty, and/or catheterization procedures, and to justify charging him and/or third-party payors for unneeded services and medical supplies used during the unnecessary procedures, then resorted to additional fraud in an effort to conceal that the procedures were contraindicated and not medically necessary.

2

4.     The fraud perpetrated by CHI and its agents included, without limitation, the following:

    a.    Face-to-face misrepresentations about the benchmark CHI and its agents would use to determine if Plaintiff needed cardiac catheterization, angioplasty, and/or stent placement procedures;

    b.    Face-to-face misrepresentations concerning the actual extent of coronary artery blockage revealed by the cardiac catheterization they had performed on him;

    c.    Charting false entries in Plaintiff's medical records about his clinical diagnosis, including the degree of blockage that was present, his current clinical condition, and/or his past medical history;

    d.    Holding themselves out as ethical, trustworthy, and compliant with applicable standards of care when they knew or had reason to know they were not;

    e.    Concealing critical information—including, but not limited to improper and/or excessive financial incentives they reaped in placing stents as well as past fraudulent behavior by them and other officers, directors, agents, servants and/or employees, actual and/or apparent —that a reasonable person would want to consider when deciding whether to consent to a particular treatment and/or by whom he or she would be treated; and so that CHI could reap improper substantial financial benefits, and also falsely enhance its individual and collective reputations in the cardiovascular field;

3

f.  Concealing from patients that CHI, directly and/or through its actual and/or apparent officers, directors, agents, servants, and/or employees, was or had been part of a conspiracy involving an improper referral and kickback scheme whereby CHI bribed Midatlantic Cardiovascular Associates, P.A. (hereinafter "Midatlantic") to have Midatlantic's physicians perform cardiovascular procedures at SJMC so that CHI could reap improper substantial financial benefits, and also falsely enhance its reputations in the cardiovascular field.

5.  CHI and its agents failed to ensure that SJMC conducted itself properly and in accordance with prevailing health care rules and regulations. This failure resulted from deliberate and wrongful conduct whereby CHI and its agents orchestrated a scheme whereby the financially influential and largest cardiology group in the state, Midatlantic Cardiovascular Associates, P.A. (Midatlantic), would funnel its clients to SJMC for lucrative procedures, many of which were risky, inappropriate, and unnecessary, in exchange for kickbacks and other financial gain. CHI and its agents allowed Midatlantic to invade SJMC's cardiology department (hereinafter, the "Heart Institute") and take over and assume the role of Medical Director of the Heart Institute and every other medical director position in the Heart Institute, with the exception of cardiac surgery. Cardiac surgery was spared this onslaught only because Midatlantic had no cardiac surgeons when it began its occupation of the Heart Institute. This did not prevent Midatlantic, however, from forcing the then director of cardiac surgery out of his position when he refused to cave into Midatlantic's extortion demands. By allowing Midatlantic physicians to serve as the Medical Director of the Heart Institute and every sub-department within the same, including without limitation the cardiac catheterization laboratory (hereinafter the "cath lab"),

4

Midatlantic physicians could make improper referrals and perform unnecessary procedures without detection. CHI took further steps to shield Midatlantic's insidious behavior in the Heart Institute from discovery by removing the Heart Institute from the normal and proper reporting and review process that other departments were subjected to and answering instead, to the CEO's direct underling. This deliberate and unorthodox act resulted in the derogation of quality assurance and peer review in the heart institute in general and especially in the cath lab, where the Heart Institute's largest and most haloed rainmaker, Mark Midei (Dr. Midei), was permitted to place unnecessary stents in hundreds of patients' coronary arteries without any oversight. All of these acts were done to ensure CHI's largest revenue maker, Midatlantic, would continue to funnel its patients through SJMC for lucrative cardiovascular procedures and that the referral of and performance of unnecessary medical procedures in the cath lab would go unheeded.

6.      On July 21, 2005, Plaintiff Carl Sullivan had the misfortune of being referred to the heart institute and being treated by Dr. Midei in the cath  lab, where Dr. Midei misrepresented to Plaintiff and in his records that his Left Anterior Descending coronary artery (LAD) in which they placed a stent was blocked a highly medically significant 90% when, in reality, the blockage in the artery was a mere medically insignificant 40% and therefore did not justify angioplasty or placement of a cardiac stent. These procedures were invasive and needlessly subjected Plaintiff to immediate and long-term serious medical risks and to lifelong medication.

7.      Plaintiff's case is not isolated; he was caught up in and victimized by an ongoing and elaborate fraudulent scheme and/or pattern of conduct by CHI and its agents, who instead of acting in the best interest of this Plaintiff and patients like him, acted first and foremost to satisfy their own avarice and self-serving goals, i.e., securing financial benefits at the risk of their

patient's health and well-being.  In doing so, CHI caused physical and emotional harm to, at a minimum, hundreds of patients, including Plaintiff, and defrauded them and third-party payors out of significant sums of money that, in the aggregate, amount to millions of dollars.

8.     As a direct and proximate result of the tortious conduct summarized above and detailed below, Plaintiff was harmed physically, emotionally, and financially, and his spouse, Dorothy Sullivan, suffered emotional and financial damages as well.

## JURISDICTION AND VENUE

9.     Venue, as conferred under MD. CODE ANN., CTS. & JUD. PROC. CODE ANN. §§ 6 201, 6-202 (West 2011), is proper in Baltimore County as CHI carried on a regular business in Maryland and/or was habitually engaged in a vocation in Baltimore County, and this cause of action arose in Baltimore County in that CHI's negligence and other wrongful conduct occurred at SJMC, a wholly owned Catholic Health Initiatives, Inc. subsidiary hospital duly organized and existing under the laws of Maryland, with its principal place of business at 7601 Osler Drive, Towson,  Baltimore County, Maryland 21204.   Jurisdiction is proper in Baltimore County Circuit Court in that all conditions precedent to filing this claim have been met.

## PARTIES AND AGENCY

10.     At all times relevant, Plaintiff Carl Sullivan was and is a resident and citizen of the State of Maryland, residing at 521 Ponderosa Drive, Bel Air, Maryland 21014.

11.     At all times relevant, Plaintiff Dorothy Sullivan was and is a resident and citizen of the State of Maryland, residing at 521 Ponderosa Drive, Bel Air, Maryland 21014, where she lives and cohabitates with Carl Sullivan in a marital relationship.

12.     At all times relevant, CHI was and is a health care organization duly organized and existing under the laws of Colorado, with its principal place of in Englewood, Colorado and

a regional corporate office in Hunt Valley, Maryland.  In the course of operating as a health care organization, CHI owns and operates health care facilities, organizations, and associations in Maryland and 18 other states.  SJMC is one of the health care facilities owned and operated by CHI in Maryland; St. Joseph Physician Enterprise (SJPE) is another health care organization owned and operated by CHI in Maryland, to be specific, it is an association of physicians who act as actual and/or apparent agents, servants, and/or employees for CHI.  Upon information and belief, at all times relevant hereto, CHI employees act in leading administration roles at SJMC, including but not limited to CEO.  In the course of operating, CHI held out itself, SJMC, SJPE, and their individual and/or collective actual and/or apparent agents, servants, and/or employees to members of the public, including Plaintiff, as competent, ethical, and trustworthy providers of cardiovascular services who complied with applicable standards of care.

13.    At all times relevant, CHI touted  its heart institute and cath lab at and its actual and/or apparent officers, directors, agents, servants, and/or employees as exemplary leaders in the cardiology field and the performance of cardiac catheterizations, angioplasty, and cardiac stent placements in the State of Maryland at all times relevant to this claim.

14.    At all times material hereto, CHI acted directly and/or through its actual and/or apparent officers, directors, agents, servants, and/or employees, including but not limited to SJMC, SJPE, its officials, administrative personnel, officers, directors, trustees, clinical and administrative department heads, medical directors, physicians, nurses, technicians, and other personnel operating within the heart institute, cath lab, and/or their direct chain of command, including without limitation, Midei, who was afforded  privileges at SJMC and served as the Director of the cath lab.

7

15.    At all times material hereto, CHI and its agents permitted Midatlantic physicians, including but not limited to Dr. Midei,[1] to make illegal and improper referrals for unnecessary medical procedures, to perform cardiac catheterizations, angioplasty, and stent placements in the cath lab; listed Midei in its marketing and informational materials as one of its leading physicians; and appointed, held out to the public, and/or allowed Midei to serve as the Director of the cath lab.

16.    Upon information and belief, at all times material hereto, with CHI's authority, Midei utilized CHI's agents actual and/or apparent agents, servants, and/or employees, including but not limited to technicians, nurses, and staff, to provide health care services to patients such as Plaintiff and to carry out the scheme to place and bill for medically contraindicated and unnecessary cardiac procedures such as cardiac catheterization, angioplasty, and/or stent implantation.  Accordingly, at all times relevant, such individuals also acted as Midei's actual and/or apparent agents who were acting within the scope of authority given to them by CHI.

17.    At all times material hereto, Midei and the other actual and/or apparent officers, directors, agents, servants, and/or employees of SJMC,  who acted on behalf of CHI, including without limitation  nurses, technicians, hospital administration, and/or staff, acted within the scope of authority given to them by CHI and or it's agent, SJMC.

18.    At all times material hereto, Midei was the Medical Director of the cath lab, and was negligently and intentionally allowed to select the patients' charts that would be examined for quality of care during peer review sessions without sufficient oversight from CHI.

19.    Upon information and belief, at all times material hereto, a kickback scheme existed between CHI, SJMC, Midatlantic, and Midei, whereby CHI and SJMC paid monies to

---

[1] On July 13, 2011, Dr. Midei's license to practice medicine in Maryland was revoked by the Maryland State Board if Physicians.

Midatlantic and Midei for the referral of patients for the purpose of receiving lucrative cardiovascular procedures performed at SJMC by Midatlantic physicians, whether or not those services were in fact medically necessary.

20.     At all times material hereto, CHI and its agents, including the Midatlantic physicians occupying the heart institute , acted in concert with one another and within the scope of authority given to them by CHI.

21.     At all times pertinent, Plaintiff sought treatment at CHI owned and operated SJMC where he was a patient seeking and receiving medical care and treatment.

## COMMON FACTUAL ALLEGATIONS

22.     On or about July 21, 2005, Carl Sullivan underwent a cardiac catheterization procedure and medically contraindicated and unnecessary angioplasty and stent implantation procedures on his Left Anterior Descending coronary artery (LAD) at the hands of CHI and its agents in the heart institute and in the cath lab.  The LAD was stenosed approximately a medically insignificant 40% and not the highly medically significant 90% represented to Plaintiff and charted in his medical records by CHI, directly and/or through its individual and/or collective actual or apparent officers, directors, agents, servants, and/or employees, including Midei.

23.     In connection with the care provided to Plaintiff at the CHI owned SJMC and by CHI's agents and given the health care provider/hospital-patient relationship that existed between them, CHI owed Plaintiff and patients like him a duty to exercise that degree of care and skill expected of a reasonably prudent-like health care provider or hospital under the same or similar circumstances, and CHI owed him a fiduciary duty as well.

24.     At all material times, CHI and its agents were engaged in and responsible for non-delegable duties that included but were not limited to: promulgating and implementing federal and state healthcare rules, regulations, policies, procedures, and protocols; evaluating, hiring, and retaining competent, adequately trained, and trustworthy physicians, technicians, nurses, and other personnel; overseeing and supervising such personnel; ensuring that quality assurance, peer review, credentialing processes and accountability programs were applied appropriately and properly throughout the hospital, heart institute, and cath lab; and ensuring that quality, honest, and appropriate care was being provided in connection with the operation of the cath lab and heart institute.  These duties, which existed to protect the health and welfare of patients, were of an ongoing nature during the times material hereto.

25.     Upon information and belief, at all material times, the CHI-employed CEO of SJMC was a member of the SJMC Medical Executive Committee, a committee that was charged with making recommendations on issues concerning Medical Staff appointments and reappointments, the granting, restricting, reducing, suspending, revoking, terminating and reviewing Medical Staff memberships, and clinical privileges, corrective actions, all matters relating to professional competency, the structure and organization of the Medical Staff and its quality assessment and improvement activities; and other matters of import to the medical staff pursuant to authority granted it under the Medical Staff Bylaws.

26.     Upon information and belief, over the course of time before Plaintiff sought care at SJMC, and thereafter while Midei continued as CHI's and SJMC's actual and/or apparent agent, servant, and/or employee, Midei performed a substantial number of medically contraindicated and unnecessary cardiac catheterization, angioplasty, coronary artery stent placement, and/or related procedures on patients at the cath lab and CHI and its agents new as

much as they received routine reports regarding the same. Despite this knowledge, CHI and its agents chose not to investigate Midei's actions because it benefited them financially.

27.     CHI's actions set forth herein were engaged in negligently, intentionally, and fraudulently in that CHI and SJMC, directly and/or through its actual or apparent officers, directors, agents, servants, and/or employees, among other things, allowed Midei to misrepresent to Plaintiff and the other patients referred to herein that, in exchange for their consent, Midei would place a stent in their arteries only in the event the degree of blockage found during the catheterization procedure exceeded generally accepted medical standards for such placement and was thus indicated and medically necessary. In making such representations to Plaintiff and other patients, Midei wrongfully induced these patients into agreeing to undergo stent placements and related procedures. When the catheterizations revealed findings that did not medically warrant stent placement, Midei grossly exaggerated the degree of blockage that appeared in each patient's diagnostic study and typically misstated each patient's clinical condition and/or medical history. In Plaintiff's case, Midei misrepresented that what was in reality a medically insignificant blockage of 40% in his Left Anterior Descending coronary artery was instead a highly medically significant blockage of 90%. Midei then falsified Plaintiff's medical records to reflect the inflated degree of blockage, which was consistent with the pattern of conduct Midei had been following and continued to follow for an extended period of time after Plaintiff's July 21, 2005 procedure as a result of CHI's derogation of their duties. Misrepresenting Plaintiff's medical condition, fraudulently inducing his consent for treatment, and performing cardiac catheterization, angioplasty, and stent placement on Plaintiff's artery LAD breached applicable standards of care. CHI and its agents' derogation of duties allowed these things to happen.

28.     In furtherance of these activities directed toward defrauding and harming patients and unjustifiably obtaining payment for unneeded services and supplies, Midei, who at all relevant times, were acting in the scope of this authority and/or employment, regularly exaggerated and even falsely stated the clinical histories and statuses of patients, including that of Plaintiff.  They did so to justify carrying out the medically contraindicated and unnecessary invasive angioplasty and stent placement procedures for which they were receiving financial reward.  In Plaintiff's case, Midei , who, at all relevant times, was acting within the scope of their authority and/or employment, knowingly and falsely represented to Plaintiff and in his medical records that, among other things, his LAD was blocked to the highly medically significant degree of 90% when the degree of blockage was, in reality, a medically insignificant 40%.  Misrepresenting a patient's degree of coronary artery blockage and medical condition were components of a pattern of wrongdoing and fraud that was engaged in and/or countenanced by CHI.

29.     At all relevant times, CHI and its agents were responsible for ensuring that its health care providers rendering care to Plaintiff at SJMC were competent, ethical, and acting within the standard of care.  These healthcare providers include without limitation, nurses, cardiac catheterization technicians, radiology technicians, and Midei, all of whom had a duty to know, among other things, the applicable standard of care relevant to: diagnosing and treating coronary artery blockages, calculating the actual degree of blockage visualized during angiography, recognizing and reporting the actual degree of blockage visualized during the angioplasty procedures, proper charting in a patient's medical records, and reporting any breaches of the standard of care through the proper chain of command.

12

30.     At all relevant times, the above-mentioned healthcare providers were present during each of the cardiac catheterizations, stent placements, and related procedures that Midei performed in in the cath lab; had access to, reviewed, and entered information into the medical records and charts of each of the patients who underwent cardiac catheterizations and other cardiac procedures by Midei in the cath lab; participated in pre-procedure work-ups on each of the patients who underwent cardiac catheterizations and other cardiac procedures by Midei in the cath lab; participated in obtaining the consent to angioplasty and stent placement; helped Midei perform catheterizations and other cardiac procedures in the cath lab; observed images of the heart and coronary arteries of each patient who underwent a cardiac catheterization and/or other cardiac procedures at the hands of Midei in the cath lab; assisted Midei in the placement of catheters, stents, and other instruments during each of the cardiac catheterizations and other cardiac procedures Midei performed on patients in the cath lab; provided post-procedure care and treatment to each of the patients who underwent cardiac catheterizations or other cardiac procedures performed by Midei in the cath lab; and participated in charting inflated degrees of coronary artery blockage claimed to have been found by Midei, despite knowing that such actions breached the applicable standard of care and constituted fraud.

31.     At all material times, CHI and its agents knew or should have known about the wrongful conduct alleged herein to have been committed by Midei, including without limitation grossly overstating the extent of patients' coronary artery obstructions and/or misrepresenting patients' medical histories; participated in the unnecessary and contraindicated procedures; and failed to prevent and/or publicly disclose Midei's actions through the proper chain of command or otherwise.

13

32.    At all material times, CHI and its agents knew or should have known about the wrongful conduct alleged herein to have been committed by Midei, including without limitation grossly overstating the extent of patients' coronary artery obstructions and/or misrepresenting patients' medical histories; participated in the unnecessary and contraindicated procedures; and failed to prevent or publicly disclose Midei's actions. CHI's derogation of its duties allowed this to happen.

33.    At all material times, CHI and each of its agents, had an independent duty to be aware of and respond appropriately and swiftly to any breaches of the standard of care that were reported to them, were known by them, or should have been known by them.

34.    At all times relevant, CHI and its agents, had actual independent knowledge and/or should have known of the unusually high numbers of angioplasty and stent procedures being performed in the cath lab in relation to the number of patients that were seen in the lab and/or industry standards. Also, at all times relevant, CHI and its agents possessed actual and/or constructive knowledge of the overutilization of coronary artery stent procedures in the cath lab to a degree that defied reasonable explanation, the pattern of wrongful conduct that was being engaged in, and the financial and other benefits that were derived by CHI and its agents as a direct result. Nevertheless, CHI and its agents failed to reveal to the public and/or to the cath lab patients what they knew about such matters, failed to prevent and/or conduct any meaningful investigation into the above-mentioned conduct, and failed to take any steps to discharge or revoke the hospital privileges of Midei and/or that of any other staff until well into the ongoing scheme described herein. CHI and its agents failed to act on a timely basis even after receiving physicians' and nurses' reports in 2000 and 2001 of Midei's unethical and fraudulent propensities regarding patient care in the cath lab and the misdirection of cardiac patients, which

ultimately led to a fraud finding against Midei in a 2005 civil lawsuit[2] in Baltimore County. This actual knowledge, none of which CHI or its agents properly investigated or adequately responded to, put CHI on notice of Midei's proclivity to defraud patients, and further, that Midei lacked the fitness to, and could not be trusted to, interact with patients without direct and close supervision. Despite such knowledge, CHI not only allowed Midei to interact with patients without credible supervision, CHI allowed him to be Director of the cath lab and further allowed him to be in charge of any peer review regarding the cath lab. If a timely and thorough investigation had been performed and appropriate action had been taken regarding Midei and the cath lab in general, Plaintiff would not have undergone the unnecessary procedures that are the subject of this Complaint. Indeed, CHI's failures to act and/or adequately respond to reports about Midei and patient care in the cath lab continued even after Plaintiff's procedure.[3]

---

[2]  In 2005, SJMC, Midei, and Midatlantic were co-Defendants in a civil suit which alleged, among other things, fraudulent misdirection of patients to Midatlantic physicians. Although SJMC was not found liable in that case, the jury did find Midei and Midatlantic liable for fraud, and this was known by SJMC and CHI.

[3]  Even after becoming aware of an April 2009 report that Midei had performed at least one unnecessary stent procedure in the Cath Lab, CHI and SJMC intentionally limited its investigation and response as to whether other patients had also fallen fate to Midei's unscrupulous behavior by arbitrarily restricting the scope of its investigation to procedures performed in 2007 or later and then, in late 2009 and early 2010, taking illusory steps to notify certain patients of the findings by sending them equivocal letters such as the following:

*Dear (Former Patient):*

*On (Date of Procedure), you had a cardiac catheterization procedure with stent placement performed at St. Joseph Medical Center.*

*I am writing to let you know that a subsequent clinical review of your cardiac catheterization report was different than the original report and may be relevant to your ongoing care and treatment. This information has been sent to (your doctor), the cardiologist identified in your medical record at the time of the procedure. If you have changed doctors, please call (representative) in the Compliance Department at (phone number) and he/she will forward the information to your current treating doctor.*

*I encourage you to contact (your doctor) to schedule an appointment to discuss the information.*

*If you have any questions, please do not hesitate to contact me at (phone number).*

35.     At all times relevant, Plaintiff justifiably relied on the special knowledge and expertise of Midei's false representations and concealment in permitting him to perform the angioplasty and stent procedures on his LAD, and in accepting the Midei's assertion that his LAD had a highly medically significant blockage of 90% that necessitated stent implantation.

36.     The injuries and damages complained of herein occurred without any negligence on the part of Carl Sullivan and/or Dorothy Sullivan contributing thereto.

37.     On July 21, 2005, Plaintiff presented to and was accepted as a patient at the cath lab for the purpose of undergoing a cardiac catheterization procedure, which is when a doctor inserts a small thin tube into an artery in the leg and advances it to the heart. Radiopaque dye is then injected to determine if there are any blockages of the coronary arteries and, if so, to what extent.

38.     Prior to the cardiac catheterization, Midei, directly and/or through other cath lab personnel improperly obtained Plaintiff's consent to place medically indicated stents and to perform related procedures, such as angioplasty, if any blockages in his arteries were significant enough, based on medically accepted percentages of blockage, to warrant the placement of a stent and to be the likely cause of his complaints and/or symptoms.

39.     Plaintiff, an individual with no specific knowledge or experience in the field of medicine or cardiology, justifiably believed, trusted, and relied on CHI to properly run SJMC and to ensure that physicians would honestly advise him, competently perform the cardiac catheterization, and place only those stents and perform those procedures that were medically indicated.

40.     Indications for the procedure were noted by Midei to be unstable angina which did not apply to Plaintiff, but which was a pattern of behavior Midei engaged in and that CHI knew and ignored or should have known but refused to investigate.

41.     During the July 21, 2005 procedure, Midei again reported that Plaintiff's LAD was blocked a highly medically significant 90%. Midei performed an angioplasty, which is a procedure normally utilized to reduce a medically significant high degree of blockage, and then placed a stent in Plaintiff's LAD despite the fact the Plaintiff did not need a stent and that the procedure was contraindicated, risky, and could result in death. CHI's failure to enforce quality assurance and peer review in the heart institute and cath lab allowed this procedure and the hundreds of other similar unnecessary medical procedures to go on undetected.

42.     Upon completion of the procedures, Midei intentionally and fraudulently informed Plaintiff and charted in his medical records that the blockage in his artery was severe enough to require angioplasty and stent placement. Specifically, they intentionally and fraudulently misrepresented to Plaintiff that his LAD was blocked 90%, despite actual or constructive knowledge that the blockage did not remotely approach 90% and that he did not require stent placement in his LAD. The degree of blockage was fraudulently inflated, among other reasons, to satisfy internal hospital and/or insurance blockage thresholds that had to be met before stent placement would be approved, as well as to result in financial benefit for CHI.

43.     A subsequent review of the cardiac catheterization procedure by a board-certified cardiologist revealed that on July 21, 2005 Plaintiff's LAD was blocked only 40% and not the 90% which was misrepresented to Plaintiff. Neither Plaintiff not any other reasonable person in Plaintiff's position would have, at the time, had actual or constructive knowledge that the July 21, 2005 stent placement and angioplasty procedures were not medically indicated, especially as

17

Plaintiff was sedated and was never given the opportunity to review his films, see the lesion and/or coherently discuss his options.  Moreover, during this time, Plaintiff did not know that he also had various causes of action against CHI due to derogation of duties that allowed this pattern of misconduct and fraud to go on.

44.     Thus, from July 21, 2005 through the review by the board-certified cardiologist, Plaintiff was under the false impression, caused by CHI and its agents' deliberate abrogation of duties and refusal to investigate and Midei's misconduct and fraud, that he had a severe obstruction of his LAD and that the cardiac stent(s) placed by CHI was medically necessary and/or indicated.

## II. COUNTS

### COUNT I – Negligence

45.     Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

46.     In their care and treatment of Plaintiff, Chi and its agents owed Plaintiff the duty to exercise that degree of care and skill which reasonably competent and prudent-like health care providers and hospitals would have exercised in meeting the standard of care under the same or similar circumstances.

47.     CHI and its agents, failed to act as reasonably prudent-like health care providers and hospitals would have acted under the same or similar circumstances, in that the failed to provide safe and appropriate care by allowing Midei and cath lab personnel to be negligent in the following ways, among others:

a.      Failing to properly diagnose and treat the underlying disease which caused Plaintiff's symptoms;

b.      Misrepresenting the criteria that would be used in deciding whether to perform angioplasty, place stents, and/or perform related procedures;

c.      Failing to accurately inform Plaintiff and accurately provide consultation to him about the accurate medical and/or physical condition of his LAD before obtaining his "informed" consent to the procedures Midei and his staff intended to perform and ultimately performed;

d.      Performing an unnecessary, invasive, and painful cardiac stenting procedure and related procedures;

e.      Inserting a stent into Plaintiff's coronary artery and performing related procedures without adequate medical justification;

f.      Misrepresenting the results of the catheterization to him and in his medical records at or about the time when such procedures were performed, to the effect that his LAD was blocked to a highly medically significant degree of 90% when, in reality, the degree of blockage was medically insignificant at 40%;

g.      Misrepresenting Plaintiff's medical history and/or then-current clinical condition in his medical records, to other health care providers, and to third-party payors;

h.      Recklessly disregarding the health and safety of Plaintiff;

i.     Failing to implement and/or follow procedures, policies, and/or protocols for the performance of safe and medically indicated cardiac catheterizations, angioplasties, and stent placements;

j.     Allowing their greed and avarice to take precedence over the well-being of Plaintiff and patients like him;

k.     Accepting financial gain for unnecessary medical procedures;

l.     Failing to properly and appropriately interpret and assess angiographic films before performing angioplasty and/or stent placement procedures;

m.    Failing to recommend alternative medical therapy or another non-surgical course of action instead of performing the unnecessary cardiac stent placement procedure;

n.     Failing to promptly recognize that the cardiac stent placement and related procedures performed on Plaintiff were contraindicated and not medically necessary;

o.     Failing to accurately document the clinical indications upon which a decision to perform a cardiac stent procedure was based;

p.     Failing to confirm or properly quantify lesion significance using well-accepted intra-procedural techniques, such as fractional flow reserve or intravascular ultrasound; and

q.     Failing to otherwise act in accordance with the relevant standards of care for a hospital of like kind with similar education, training, and experience; and facilities, staffing, and capabilities, as the case may be.

48.     Furthermore, and in addition to the deviations set forth in the above Paragraph, CHI and its agents were negligent and failed to exercise that degree of care and skill generally required of like medical entities under the same or similar circumstances, and thus deviated from the applicable standard of care in at least the following ways, among others:

a.     Failing to reasonably and/or adequately credential, train, supervise, instruct, and/or monitor and thoroughly review the practices of its actual and/or apparent officers, directors, agents, servants, and/or employees, including but not limited to Midei, in connection with procedures performed in the cath lab;

b.     Negligently, intentionally, and otherwise wrongfully continuing to retain in its employ and/or extend privileges to Midei to perform interventional cardiovascular procedures at SJMC and permit Midei to serve as Director of the cath lab;

c.     Holding out Midei as an ethical, trustworthy, and honest interventional cardiologist who complied with applicable accepted practices of medical care, had patients' best interests at heart, and was worthy and deserving of his privileges and performing interventional cardiology at SJMC, and indeed while serving as director of the cath lab, while concealing information about which they were aware that would have revealed to Plaintiff and similarly situated patients that the opposite was true;

d.     Failing to establish and/or enforce procedures, policies, and/or protocols regarding management of patients such as Plaintiff, who presented to the heart institute and cath lab for diagnosis and treatment;

21

e.  Failing to establish policies and procedures to ensure that adequate, unbiased, and valid peer reviews were performed in the cath lab and/or retrospectively through appropriate chart reviews;

f.  Failing to establish and/or enforce procedures, policies, and/or protocols to ensure that invasive procedures such as cardiac catheterization, angioplasty, and stent implantation were medically indicated before they were performed;

g.  Failing to establish and/or enforce procedures, policies, and/or protocols to ensure that patient histories were charted accurately in patient records;

h.  Failing to establish and/or enforce procedures, policies, and/or protocols to report inaccurate charting of patient records utilizing a proper chain of command;

i.  Failing to establish and/or enforce procedures, policies, and/or protocols to ensure patient safety;

j.  Failing to establish and/or enforce procedures, policies, and/or protocols to protect patients from unnecessary medical procedures;

k.  Failing to enforce established procedures, policies, and/or protocols to determine when arterial blockage is sufficient to warrant stent placement;

l.  Failing to enforce established procedures, policies, and/or protocols to prevent employees and/or agents from falsifying patient medical records;

m.  Failing to establish and/or enforce procedures, policies, and/or protocols in accordance with accepted standards of care to ensure that its physicians

obtained informed consent from its patients to perform the types of procedures that were performed on Plaintiff and patients like him;

n.    Establishing and countenancing an improper financial relationship with Midatlantic and Midei, which incentivized his performance of excessive stent placements, including those that were medically unnecessary;

o.    Failing to ensure that only competent and trustworthy personnel were granted medical privileges with CHI at SJMC;

p.    Failing to ensure that only competent and trustworthy personnel were appointed as heads and/or directors of individual medical departments;

q.    Failing to ensure that only competent and trustworthy health care providers were entrusted to use CHI's medical tools, equipment, and/or facilities;

r.    Failing to ensure that its actual and/or apparent agents, servants, and/or employees honored their fiduciary duties of good faith, honesty, trust, and fair dealings with patients;

s.    Failing to ensure that proper policies, procedures, and/or protocols were in place to prevent CHI's agents, Midatlantic and Midei from violating any regulations or laws;

t.    Failing to heed warnings of mismanagement, improper behavior, and/or defalcations alleged against Midei and failing to take action appropriate to the situation;

u.    Appointing Midei as the cath lab director, then further holding him and itself out to be competent and fit health care providers despite actual and/or constructive knowledge to the contrary;

v.    Making promises and/or allowing promises to be made to Plaintiff that they knew or should have known would not have been kept;

w.    Failing to ensure that the CHI/SJMC healthcare providers who cared for Plaintiff adhered to their express promise to provide the "best treatment" for Plaintiff's condition, as made in the cath lab Procedure Consent Form and which was promised to Plaintiff;

x.    Failing to respond appropriately and swiftly to breaches of the applicable standards of care that were reported to them, were known by them, or should have been known by them; and

y.    Failing to ensure that Plaintiff was referred to and/or treated by only competent and trustworthy health care providers.

49.    Each of the above failures by CHI and its agents was a violation of the duties they owed to Plaintiff and patients like him. As a direct and proximate result of the above-mentioned deviations from the applicable standards of care, Plaintiff, without any contributing negligence on his part, suffered and/or will suffer the following permanent injuries, among others:

a.    He endured painful, dangerous, physically injurious, and unnecessary cardiac catheterization, stenting, and angioplasty procedures;

b.    He has sustained permanent injury to his heart and body;

c.    He has in the past sustained, currently sustains, and will sustain in the future significant physical pain, mental anguish, and emotional distress;

d.   He is at risk for developing stent thrombosis and significant stenosis at or around the site of the stent(s) placed in his LAD, and associated complications, including without limitation heart damage, brain damage, and death;

e.   He has sustained pecuniary losses in the past and will continue to incur such loss in the future;

f.   He has lost earnings and/or has a reduced earnings capacity;

g.   He has incurred unnecessary medical expenses and will continue to incur substantial medical, pharmaceutical, and other costs as a result of the CHIs' negligence and otherwise wrongful conduct;

h.   He underwent subsequent and repeat cardiac procedures that caused him to sustain emotional, physical, and financial damages;

i.   He has experienced and will continue to experience diminished quality and enjoyment of life; and

j.   He was unable to perform his customary and regular household and familial duties.

50.   The tortious conduct alleged in this count was engaged in deliberately, consciously, willfully, wantonly, with actual malice and intent to harm Plaintiff physically, financially, and otherwise, and with intentional disregard for his health and safety.

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against Catholic Health Initiatives, Inc., in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT II – Fraud by Intentional Misrepresentation

51.     Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

52.     CHI and its agents, pursuant to applicable standards of care, and its fiduciary duty, and otherwise, owed a duty to Plaintiff and similarly situated individuals to ensure that Midei and cath lab personnel would refrain from recklessly and/or intentionally making false representations or engaging in behavior that they knew or should have reasonably been expected to know would mislead Plaintiff and similarly situated individuals about material facts relating to:

        a.     The medical necessity, *vel non*, of any catheterization, angioplasty, and or stent procedures they would perform;

        b.     The purpose of the catheterization;

        c.     The criteria that would be used to determine if a stent would be placed;

        d.     Plaintiff's true medical condition, including the actual degree of the blockage in his artery;

        e.     Their ethics and trustworthiness; and

        f.     The quality of care rendered by Midei in the cath lab.

53.     CHI violated the forgoing duties they owed to Plaintiff. It did so by knowingly making misrepresentations and assurances regarding each of the above duties to him with the knowledge that he would rely on such misrepresentations and assurances, and for the purpose of defrauding and inducing him to submit to interventional cardiovascular services at the hands of

Midei.   Plaintiff indeed justifiably relied on such misrepresentations, and assurances, and behavior to his detriment.

54.     When CHI and its agents allowed Midei and cath lab personnel to meet with Plaintiff on July 21, 2005 to discuss the catheterization procedure, they misrepresented to him orally and/or in writing that:

   a.     The catheterization, angioplasty, and/or stent procedures were medically indicated;

   b.     The purpose of the procedure was, among other things,

      i.     To identify any coronary artery blockages causing ischemia,

      ii.     To determine the "best treatment" available for his condition; and

      iii.     To "select the most appropriate procedure(s) to open the blockage(s);

   c.     They would select the most appropriate procedure(s) to open the blockage(s);

   d.     They would only perform an angioplasty and/or stent placement if such procedures were medically indicated as determined by generally accepted medical standards of percent occlusion in his arteries;

   e.     The degree of blockage in his LAD was 90%;

   f.     The blockage in his LAD was highly medically significant and required angioplasty and/or stent placement;

   g.     They would not unreasonably jeopardize his health and welfare;

   h.     Each of them were trustworthy and ethical; and

        i.      Each of them was a competent health care provider acting within the medical standards of care appropriate to them collectively and/or individually.

55.    Each of the misrepresentations and assurances above were knowingly and intentionally made in that the CHI and its agents knew, among other things, that:

        a.     Plaintiff's condition did not require a catheterization, angioplasty, and/or stent placement procedure;

        b.     Regardless of whether the degree of blockage discovered met known medically indicated percentages for stent placement or was the most appropriate or best treatment for Plaintiff's condition, CHI's true purposes for performing the catheterization was because it intended to place a medically contraindicated stent or stents in at least one of Plaintiff's arteries and to intentionally and fraudulently document a blockage or blockages significantly higher than the minimum requirements to justify such action regardless of the fact that such actions would unreasonably jeopardize his health and welfare;

        c.     The actual degree of blockage in Plaintiff's LAD was a medically insignificant 40%, which did not require angioplasty or stenting, and not the misrepresented highly medically significant 90% they reported to him and in his records;

        d.     The past and ongoing behavior of CHI's individual and/or collective actual or apparent officers, directors, agents, servants, and/or employees

28

called into doubt their collective and/or individual ethics and/or trustworthiness; and

e.    CHI's past and ongoing medical care being provided in the cath lab did not comply with the medical standards of care appropriate to CHI.

56.    As was part of CHI's intent all along, it violated the assurances its agents gave to Plaintiff in that they made the above misrepresentions with actual and/or constructive knowledge that such representations were false and with the expectation that Plaintiff would rely on these false statements and false entries made in the medical records.  These misrepresentations were made with the knowledge that Plaintiff would rely on them to his detriment, to induce Plaintiff to consent to catheterization and related procedures, and to cause him to believe the procedures were medically required.

57.    Plaintiff had no reason to know that Midei's misrepresentations were untrue, and thus, as a result of those misrepresentations, Plaintiff was in fact induced to enter into the agreement with them whereby he agreed to consent to the catheterization, angioplasty, and stent procedures with a promise to pay good and valuable consideration therefor.

58.    Midei violated the forgoing duties it owed to Plaintiff. He did so knowing that Plaintiff would rely on such misrepresentations, and for the purpose of inducing Plaintiff to submit to interventional cardiovascular services at the hands of the Midei.  Plaintiff indeed justifiably relied on such misrepresentations and behavior to his detriment, all of which was allowed because CHI and its agents derogated their duties.

59.    When CHI and its agents allowed Midei and cath lab personnel to meet with Plaintiff on July 21, 2005 to discuss the criteria that would be used to determine the medical necessity of angioplasty or stent placement, Midei represented that he would only be placing

medically necessary stents, as determined by generally accepted medical standards of percent occlusion of an artery necessary to justify such procedures. These criteria, however, were knowingly and intentionally misrepresented in that Midei knew that, regardless of whether the degree of blockage discovered met known medically indicated percentages for stent placement, he intended to place a stent or stents in at least one of Plaintiff's arteries and to intentionally and fraudulently document a blockage significantly higher than the minimum requirements to justify such action. CHI and its agents allowed Midei and cath lab personnel to knowingly and falsely assured Plaintiff that Midei would perform procedures only if they were medically necessary and would not unreasonably jeopardize his health and welfare. As was part of Midei's intent all along, he violated the assurances given to Plaintiff. These misrepresentations were made with the knowledge that Plaintiff would rely on them to his detriment, in order to induce Plaintiff to consent to catheterization and related procedures, and to cause him to believe the procedures were medically required.

60.    At or around the time of the stent and related procedures, CHI and its agents allowed Midei and cath lab personnel to intentionally and fraudulently misrepresented to Plaintiff that his LAD had a blockage of 90% when, in fact, the degree of blockage was medically insignificant and only 40%. This and other misrepresentations were made with actual and/or constructive knowledge that such representations were false and with the expectation that Plaintiff and others would rely on these false statements and false entries in his medical records. Such representations were made in an effort to justify the angioplasty and stent procedures performed, and to thereby enable CHI and SJMC to bill and receive payment from Plaintiff and to qualify for third-party reimbursement. Such reimbursement from private health insurance

carriers and Medicare would have been available for blockages of 90%, but not blockages that amounted to only 40%.

61.     CHI and its agents allowed Midei and cath lab personnel to commit further fraud by charting in Plaintiff's medical records that his LAD was blocked 90%. Even though Midei was well aware that all of his misrepresentations were false, would be relied on by Plaintiff and his physicians regarding any future diagnosis and treatment, and would increase Plaintiff's concerns about his cardiovascular health, Midei made them nonetheless. Plaintiff, his physicians, and third-party payors did in fact rely on Midei's intentional misrepresentations to their detriment.

62.     At all times relevant hereto, CHI and its agents had a duty to know, knew and/or had reason to know that Midei was engaged in the practice of performing unnecessary cardiac catheterization, angioplasty, and stent placement procedures on patients in the cath lab.

63.     CHI and its agents allowed Midei to act with willful disregard for Plaintiff's health and safety and with the intent to injure Plaintiff physically, emotionally, and economically through the performance of the unneeded invasive procedures. They did so despite assurances given to Plaintiff that Midei would only place stents if they were medically necessary. This conduct caused Plaintiff to incur unnecessary expenses associated with undergoing the angioplasty and stent procedures that are the subject of this Complaint, and to suffer other damages. Furthermore, this conduct was part of an ongoing fraudulent scheme to extract monies from Plaintiff and many other of the cath lab patients to pay for all or a portion of the unnecessary care he or they received, and to defraud third-party payors who might be required to contribute to the payment of the charges for such unnecessary care and treatment.

64.     The misrepresentations CHI and its agents allowed Midei and cath lab personnel to make were justifiably relied upon by Plaintiff and were material to his consent to the placement of stents and/or his belief that such procedures were medically required.  Plaintiff justifiably and reasonably relied on representations made about the cardiac catheterization results, the doctor/hospital-patient relationship of trust and confidence, Midei's apparent expertise, and Midei's convincing personality in deciding to consent to the placement of any stents at all and his belief that the procedures he endured were medically required.  But for these false and fraudulent statements, Plaintiff would not have consented to the placement of any stents during the catheterization procedures, and would not have believed that he needed angioplasty and stenting for his health and welfare or that the procedures were done in his best interest.  Had he known the truth about these matters, which were material to his decision making about his cardiovascular care, Plaintiff, and any reasonable person in his position, would have declined to undergo the invasive procedures that are the subject of these claims, would not have believed the procedures were medically required, and would not have paid for and/or permitted payment to be made for them.

65.     At the time CHI and its agents allowed Midei and cath lab personnel, as well as themselves to engage in these intentional fraudulent activities, each were acting within the scope of the authority given to each other by one another.  As such, CHI had actual and/or imputed knowledge of these intentional tortious acts.

66.     CHI's fraudulent and wrongful conduct alleged herein was reckless, deliberate, conscious, willful, wanton, and engaged in with actual malice and intent to physically and financially harm Plaintiff.  Additionally, the fraudulent and wrongful conduct At the time CHI and its agents allowed Midei and cath lab personnel to engage in was reckless, deliberate,

32

conscious, willful, wanton, and engaged in with actual malice and intent to physically and financially harm Plaintiff.

67.     CHI further breached their aforesaid duties to deal honestly and above-board with Plaintiff and to not mislead him about Midei's character, competence, and/or ethics.  Despite possessing information, and indeed knowing firsthand, that Midei was unethical and dishonest in his dealings with patients when he made decisions and recommendations about where and by whom patients should receive cardiovascular care, with overriding concern being placed on the financial benefit he, Midatlantic, CHI, and SJMC would receive and not on the best interests of patients, CHI and its agents intentionally withheld such information from Plaintiff and the public.  Instead, CHI's agents continued to give Midei privileges at SJMC, elected to retain Midei as Director of the cath lab, allowed Midei to deal directly with patients, gave Midei responsibility for evaluating the quality of care he provided, and continued to allow the Heart Institute and cath lab to practice in a manner that would avoid detection.  This behavior, together with marketing and informational material CHI disseminated to the public about Midei and the cath lab, had the expected and desired effect of misleading Plaintiff into believing that Midei was a doctor to whom he could entrust his cardiovascular health and well-being.  CHI and its agents held out to Plaintiff and to the public that Midei operated The cath lab ethically and in accordance with accepted standards of care, even though they knew of information that Midei did not have the characteristics and qualities CHI and its agents held him out to have and that patients he treated would be at an unreasonable degree of risk of suffering injury and being treated unnecessarily at Midei's hands, which would have put any reasonable hospital or other health care provider on notice.

68.     At all times relevant and, in particular, prior to Plaintiff undergoing the angioplasty and stent procedures that are the subject of this claim, CHI and its agents knew of complaints from reliable CHI and/or SJMC personnel against Midei and certain Midatlantic physicians involving fraud.  CHI and its agents were aware that credible nurses in their employ learned of examples of Midei and certain Midatlantic physicians fraudulently misdirecting cardiac surgery patients away from the physicians of their choice, where those physicians were in a competing practice against Midei and Midatlantic.  Indeed, CHI and its agents were well aware of this fact, as SJMC was a named party in civil fraud litigation against SJMC, Midatlantic, certain Midatlantic physicians, and Midei regarding such practices.  CHI was further aware that a civil jury had unanimously found Midei, Midatlantic, and another Midatlantic physician responsible for defrauding a patient in connection with misdirecting that patient to a Midatlantic physician and for not validly obtaining the patient's informed consent to undergo cardiac bypass surgery at the hands of the Midatlantic-employed surgeon.  CHI knew the jury found that this instance was but one example of Midei's and Midatlantic's established plan and pattern of violating informed consent requirements by misdirecting patients from the doctors of their choice in competing practices to Midatlantic physicians so that Midei and/or his professional association could reap financial gain.  Although an appellate court remanded the case to circuit court for further proceedings based on an evidentiary technicality, the appellate court went on to note that the fraudulent actions claimed against Midei and Midatlantic were sufficient to support a compensatory and punitive damages claim against them.  Upon information and belief, CHI further knew that, since 1996 and even beyond the time of the procedures that are the subject of this claim, CHI participated and was engaged in a kickback

scheme regarding referral of patients to SJMC, whereupon payments were made by CHI and SJMC that benefited Midatlantic and Midei for funneling cardiovascular patients to SJMC.

69.     Moreover, upon further information and belief, at all times material hereto, CHI and its agents knew of and/or should have known Midei's performance of angioplasties and cardiac stent procedures on patients who did not medically require them and who consented as a result of an intentional failure to obtain valid informed consent to such procedures.

70.     Not only did CHI and its agents fail to disclose the knowledge it possessed about Midei in this regard, it affirmatively and fraudulently held Midei out to Plaintiff and the public as a competent diagnostic and interventional board-certified cardiologist who adhered to accepted standards of care and was a trustworthy, honest, and ethical physician on whom patients and the hospital could rely.

71.     At all times relevant, CHI and its agents held out Midei in the foregoing fraudulent and otherwise wrongful manners, despite knowing the contrary was true, with the knowledge and belief that patients such as Plaintiff would rely on them and accept treatment at the cath lab from Midei as a result.  And Plaintiff did, in fact, justifiably rely on CHI and its material misrepresentations about Midei, the heart institute and cath lab, and his medical condition, as they anticipated he would.

72.     The tortious conduct of CHI relative to its participation in and facilitation of Midei's and/or Midatlantic's negligent, intentional, and fraudulent conduct that is alleged in this count and elsewhere in this Complaint was engaged in deliberately, consciously, willfully, wantonly, with actual malice and intent to injure Plaintiff physically, and to defraud him and any third-party payors who might contribute to payment of his bills for the services and supplies provided by CHI.

73.     All of the facts misrepresented by CHI and its agents and Midei were material to Plaintiff's decision to undergo the stent and related procedures and/or to accept and believe that those procedures were medically required.

74.     As a direct and proximate result of the intentional misrepresentations and fraudulent holding out of Midei as aforesaid on the part of CHI and its agents, Plaintiff has suffered the injuries enumerated in this Complaint, as well as mental anguish and emotional distress as a result of having been defrauded by his trusted health care providers.

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against Catholic Health Initiatives, Inc., in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT III – Fraud by Concealment

75.     Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

76.     At all times material hereto, CHI and its agents including Midei and the heart institute and cath lab personnel were in a position of trust with Plaintiff and patients like him, and thus owed Plaintiff and patients like him the duty to be truthful and honest with him and to disclose the following material facts, among other things, to him:

    a.     The adverse information and facts they possessed about the medical ethics, or lack thereof, and pattern of failing to adhere to applicable standards of care as they related to the performance of interventional cardiovascular services at The cath lab;

36

b.    The true degree of blockage in Plaintiff's artery;

c.    Their motivations and true intentions with respect to performing the cardiac catheterization procedure on Plaintiff;

d.    That he did not require angioplasty and/or stent placement;

e.    The actual criteria they would use in making healthcare decisions about him; and

f.    Their improper financial relationship with each other, wherein they incentivized their collective and/or individual performance of excessive stent placements, including those that were medically unnecessary.

77.    CHI and its agents knew that such information and facts were material to Plaintiff and would have been material to any reasonable person in the course of making decisions about the nature and extent of cardiovascular care to undergo, where and by whom any such care should be performed, and the nature and extent of Plaintiff's true medical condition, and further knew that Plaintiff would not have consented to any of the above if such information had been revealed. The nature and extent of such material information that should have been revealed, all of which was adverse to CHI, but was concealed from Plaintiff, is set forth in the previous and subsequent counts and paragraphs above and below, and adopted by reference herein.

78.    At all times relevant, CHI At the time CHI and its agents allowed Midei and cath lab personnel to negligently, intentionally, and fraudulently conceal from Plaintiff information about the following, which was known or should have been known to them: their true intentions with respect to performing the cardiac catheterization procedure; that they intended to place a stent in Plaintiff's artery whether medically indicated or not; that Plaintiff's condition did not require catheterization, angioplasty, and/or stent placement; that they were in an improper

financial relationship with each other, wherein they incentivized their collective and/or individual performance of excessive stent placements including those that were medically unnecessary; the true degree of blockage in his artery; the past and ongoing behavior that called their ethics and trustworthiness into question; and that they were not providing medical care in the Cath Lab that complied with the applicable standards of care for cardiac patients like Plaintiff.

79.     At all times relevant, CHI had actual and imputed knowledge that Midei fraudulently, intentionally, and negligently: advised Plaintiff that to undergo unnecessary stent and related procedures; performed medically contraindicated and unnecessary stent and related procedures; failed to obtain proper informed consent from Plaintiff; misrepresented to Plaintiff and in his medical records that his LAD was blocked to a highly medically significant degree when that was not the case; and further falsified records by inflating and/or fabricating Plaintiff's cardiovascular clinical and diagnostic findings. At all times relevant, CHI and its agents possessed information about Midei and Midatlantic being found liable for substantial monetary damages in connection with committing fraud upon, and failing to obtain informed consent from, a patient in order to achieve financial gain for Midei's own benefit and/or for the professional association with which he was affiliated at the time. At all times relevant, At the time CHI and its agents had a duty to be aware and were in fact aware of Midei's practice of performing medically unnecessary angioplasty and stent procedures, and were otherwise conducting themselves fraudulently.

80.     The foregoing were material facts that CHI knew, or should have known, would have been important to Plaintiff in deciding whether to undergo any care at the hands of Midei and other Midatlantic physicians operating out of the Heart Institute, or to undergo a stent and

angioplasty based on Midei's purported assessments of the blockage, the need for stent placement, and Plaintiff's understanding of his true medical condition.

81.    At all times relevant hereto, CHI, SJMC, Midatlantic, and/or Midei were part of a conspiracy involving a referral and kickback scheme whereby CHI and/or SJMC paid Midatlantic for lucrative cardiovascular procedures that Midatlantic physicians funneled through and performed in the Heart Institute.  This too was a material fact that would have been important to Plaintiff in deciding whether to undergo any care at the hands of CHI, SJMC, Midei, and/or Midatlantic physicians operating out of SJMC, or to undergo a stent and angioplasty based on Midei's purported assessment of the blockage, the need for stent placement, and his understanding of his true medical condition.

82.    Despite all such knowledge, CHI and its agents intentionally, willfully, and wantonly concealed these material facts from Plaintiff so as to induce him to submit to the surgical procedures at SJMC and at the hands of Midei.  Further, CHI and its agents deliberately turned a "blind eye" and failed to investigate the operations of the cath lab and of Midei's and/or Midatlantic's conduct therein and/or to halt Midei's and/or Midatlantic's tortious behavior, despite the facts about which they were aware.  CHI's intentional and unjustified non-disclosure, concealment, refusal to know, and inaction caused great harm to Plaintiff and resulted in financial gain and prestige to CHI, as CHI had intended and reasonably should have expected, and indeed did expect.

83.    Further, upon information and belief, at all times relevant, CHI and its agents knew that Midei and The cath lab, independent of any information it had about Midei's wrongful activities as set forth in this Complaint, were performing more stent and related procedures than could reasonably be explained.

84.     Despite all such knowledge, CHI and its agents further intentionally turned a "blind eye" and failed to investigate the operations of the heart institute and cath lab, and Midei's conduct therein and/or to halt Midei's tortious behavior, despite the serious irregularities about which they were aware.  CHI's intentional non-disclosure, concealment, refusal to know, and inaction caused great harm to Plaintiff and resulted in financial gain and prestige to CHI and its agents, as they had intended and expected.

85.     At all times relevant, CHI and its agents held out Midei, the cath lab unit, and its other staff members as highly competent, exemplary, and ethical providers of diagnostic and interventional cardiology services while intentionally concealing that at least some of CHI's actual or apparent officers, directors, agents, servants, and/or employees were aware of, should have been aware of, had a duty to be aware of and/or reasonably suspected many of the negligent, intentional, and fraudulent practices that were taking place.  Such suspicions were premised upon, among other things, the information possessed by Cath Lab employees who actively participated in and were present during such wrongful conduct, as well as other CHI personnel who reported such wrongful conduct as previously alleged.

86.     CHI and its agents had imputed knowledge of the negligent and intentional tortious acts observed by cath lab nurses, cardiac catheterization technicians, radiology technicians, and other CHI agents, servants, and/or employees, and of the reasonable and justified suspicions held by yet other of its agents about the substandard and/or fraudulent care being rendered at the cath lab.

87.     CHI's agents owed a duty to Plaintiff and to patients like him to disclose the above facts, each of which, independently or collectively, would have been relevant and material to Plaintiff undergoing treatment at SJMC, his consenting to angioplasty and stenting, and

40

whether he should rely on Midei's competency and representations about the claimed LAD blockage. Such material facts included all of the information known by CHI as set forth above and incorporated in this count by reference.

88.     CHI and its agents intentionally concealed every aspect of the knowledge they had about the substandard and fraudulent care that was being rendered at the cath lab, the information they had about the finding of fraud against Midei and Midatlantic in court, the kickback scheme, and all other adverse information set forth in this Complaint, which was material to Plaintiff's ability to validly and intelligently consent to treatment and to choose a facility at which he would receive treatment, all of which they had a duty to disclose. The failure to disclose such information caused Plaintiff to undergo the July 21, 2005 stent and related procedures and to accept the claim that his LAD was blocked 90%, thereby making such procedures medically required. Withholding any of the foregoing information, including without limitation information about specific and/or individual acts of negligence, the failure to obtain informed consent, fraud, and a pattern of such conduct, was done so Plaintiff would reasonably rely on Midei's statements, which he ultimately did, to his detriment.

89.     CHI and its agents knew that Plaintiff would have declined the cardiac catheterization procedure performed at the cath lab, and he would have declined the stent and related procedures entirely had CHI and its agents disclosed to him any of the alleged fraudulent acts relative to cardiac patients and procedures against Midei, Midatlantic, and/or Midatlantic physicians, all of which CHI's agents had a duty to disclose because of the materiality thereof.

90.     Plaintiff relied, to his detriment, on the belief that CHI would properly perform its functions of providing and ensuring safe quality care at SJMC and that SJMC and the healthcare providers, including Midei, were good, competent, and honest health care providers who

41

complied with applicable standards of care generally and in the operation of the cath lab specifically, and was justified in that reliance as a result of CHI's concealment of the material facts set forth above.

91.    Had CHI's agents not concealed such material facts, Plaintiff would have not undergone any of the procedures Midei performed at the cath lab, nor would he have chosen SJMC, a wholly owned subsidiary of CHI, as the facility at which he would receive care.  CHI wanted Plaintiff to undergo such procedures, and it was for that reason that they intentionally withheld the material facts set forth above.

92.    The tortious conduct of CHI alleged in this count was engaged in deliberately, consciously, willfully, wantonly, with actual malice and intent to harm Plaintiff physically, emotionally, and financially, and with intentional and reckless disregard for his health and safety.

93.    As a direct and proximate result of the intentional concealment of material facts on the part of Midei, all of which CHI and its agents allowed, Plaintiff justifiably relied on the concealment and has suffered the injuries previously enumerated in this Complaint, as well as mental anguish and emotional distress as a result of having been defrauded by his trusted health care providers.

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against Catholic Health Initiatives, Inc. in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT IV – Negligent and Intentional Hiring, Privileging, and Appointing Director and Continuing Retention

94.     Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

95.     CHI and its agents owed a duty to Plaintiff to use reasonable care to select an agent, servant, and/or employee who was competent and fit to perform the duties required of a reasonable interventional cardiologist.

96.     CHI and its agents owed a duty to Plaintiff to use reasonable care to select, appoint, and/or approve of an agent, servant, and/or employee who was competent and fit to perform the duties required of a Director of the cath lab, including without limitation: operating the lab; obtaining informed consent from patients in the lab; properly reading patients' charts, diagnostic reports, and/or other records; charting a patient's history and/or diagnosing a patient's condition accurately, completely, and/or truthfully; and performing proper and valid peer reviews of work performed in the cath lab.

97.     CHI and its agents owed a duty to Plaintiff to use reasonable care to select and grant privileges to officers, directors, agents, servants, and/or employees who were competent and fit to perform the duties required of the health care providers operating in or out of its facility and/or providing services in its facility.

98.     CHI and its agents negligently and/or intentionally breached their duties to Plaintiff when, collectively and/or individually, they hired, engaged, contracted with, and/or continued to employ, grant privileges to, engage, and/or contract with Midei in that capacity, given the previously alleged actual and constructive knowledge CHI and its agents possessed about Midei, and the additional knowledge CHI and its agents gained about Midei and/or had

43

available to them over time.  CHI and its agents knew and/or should have known and foreseen: that Midei was not fit to perform the responsibilities of the position for which he was hired, engaged, granted privileges, and/or contracted to perform, and/or permitted to continue to perform in any such capacity; that Midei presented an unreasonable risk to commit negligent, intentional, and/or fraudulent acts while performing cardiovascular services for them or while privileged to practice at SJMC; and that doing so unreasonably exposed patients such as Plaintiff to serious harm.

99.    CHI and its agents further negligently and/or intentionally breached these duties when they entered into and/or continued to remain in a financially-motivated scheme with Midatlantic and Midei whereby CHI and its agents reaped financial benefit for referrals for cardiac procedures performed in the cath lab.  CHI and its agents knew and/or should have known and foreseen that such a relationship would create the unreasonable risk that Midatlantic physicians operating and/or working out of and/or in Heart Institute and cath lab would consider and factor their own financial desires and/or greed ahead of their patients' health and safety when deciding whether to perform certain cardiac procedures, and that doing so unreasonably exposed patients such as Plaintiff to serious physical and financial harm and further risked cultivating an atmosphere that would likely lead to illegal kickback schemes and/or insurance fraud, all of which ultimately occurred.[4]

100.    CHI and its agents further negligently and/or intentionally breached those duties when they hired, appointed, engaged, contracted with, and/or continued to employ, engage, and/or contract with Midei in the capacity of Director of the cath lab, given the previously

---

[4] Although SJMC did not admit to any such conduct, it later entered into an agreement with the Department of Justice to resolve any allegations against it by paying a large financial penalty and by further agreeing to adhere to a Corporate Integrity Agreement designed to prevent such situations from occurring again.

alleged actual and constructive knowledge they possessed about Midei and the additional knowledge CHI and its agents gained about Midei and/or was made available over time.

101.   CHI and its agents should have been especially suspicious and concerned about Midei's honesty and trustworthiness and/or the potentiality of future fraud schemes between and by Midei and certain Midatlantic physicians relative to patient care and disclosures following the 2005 unanimous decision by a Baltimore County jury that Midei had deliberately defrauded a patient into believing that his heart surgeon was not available to perform a bypass operation so that a Midatlantic surgeon could assume such care.  Midatlantic and/or Midei reaped a financial benefit as a result of this fraudulent activity.  With knowledge about that court case and its underlying allegations and facts, it should have been apparent to CHI and its agents that greed was a driving force for Midei and at least one other Midatlantic physician, and that it took priority over a patient making an informed selection of a treating physician, even when the care involved was as serious as coronary artery bypass surgery.

102.   CHI and its agents intentionally breached their duty to use reasonable care when they selected and retained Midei to serve as medical director, despite the fact that Midei was not competent nor fit for the position.  They did so in part because stent procedures were a huge source of revenue for CHI and SJMC and that benefit to CHI outweighed any concern CHI and its agents should have had about the welfare of Midei's patients.  Furthermore, discharging Midei entailed a heightened risk as reasons for doing so might come to the attention of third-party payors and/or government authorities, including those who investigate and prosecute Medicare and/or insurance fraud.

103.    CHI and its agents failed to inquire, probe, examine, and/or investigate Midei's competency, let alone discharge him, because CHI, profited so handsomely and were significantly enriched by ignoring the conduct.

104.    CHI and its agents intentionally breached the foregoing duties by engaging, hiring, and/or contracting with Midei; granting privileges to and appointing Midei as Director of the cath lab; retaining Midei in their employ and/or service; continuing to grant privileges to Midei; allowing him to continue to serve as the cath lab Director as set forth above; and in the following ways, among others:

    a.    Failing to give reasonable and adequate weight to the unfavorable information set forth above possessed by each of them;

    b.    Failing to establish and/or enforce and/or review the criteria Midei used to determine stent placement;

    c.    Failing to identify and/or ignoring that Midei misrepresented the degrees of blockages by inflating the actual degrees of blockages to amounts higher than internal policies and/or Medicare policies that would trigger reimbursement;

    d.    Hiring, engaging, contracting with, and/or keeping Midei as cath lab director, despite information that CHI knew or should have know about Midei's negligent, intentional, and fraudulent behavior in his capacity as a cardiologist;

    e.    Failing to police their own individual actual and/or apparent officers, directors, agents, servants, and/or employees after learning of the fraudulent acts set forth herein; and

f.     Granting and allowing Midei to maintain privileges to practice diagnostic and interventional cardiology with and/or at SJMC.

105.   CHI's tortious conduct alleged in this count was engaged in willfully and wantonly, with actual malice and intent to reap great financial reward at the expense of subjecting Plaintiff and patients like him to serious and potentially life-threatening harm by causing them to undergo unnecessary stent and angioplasty procedures and other cardiac procedures, and to deal with the associated risks.

106.   As a direct and proximate result of CHI's negligent, and even intentional, wrongful hiring, privileging, and/or appointment as Director, and/or continuing any such relationship with Midei, Plaintiff suffered the injuries enumerated in this Complaint.

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against Catholic Health Initiatives, Inc. in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT V – Negligent and Intentional Failure to Supervise

107.   Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

108.   At all times relevant, CHI owed a duty to Plaintiff and patients like him to use reasonable care to credential and re-credential physicians who were competent and fit to perform the duties expected of Midei as a cardiologist specifically and as a physician in general; to adequately and properly supervise Midei so as to ensure that he practiced diagnostic and interventional cardiology in accordance with applicable standards of care and in an honest and

trustworthy manner as to avoid exposing heart institute patients to an unreasonable risk of injury and subjecting them to fraudulent conduct; and to retain only qualified, honest, and trustworthy personnel.

109.    At all times relevant, and in particular, prior to the cardiovascular procedures performed on Plaintiff that are the subject of this claim and proceedings, CHI and its agents breached that duty by hiring, engaging, contracting with, and allowing Midei to practice medicine at their facilities; failing to adequately and properly supervise, oversee, and regularly review Midei's care of Plaintiff and patients like him; appointing Midei as director of the cath lab; and/or allowing Midei to maintain such positions in light of the previously mentioned actual and constructive knowledge they had about Midei.  Indeed, CHI and its agents totally ignored those duties in that they further failed to provide any independent peer review of Midei's activities after obtaining knowledge of a fraud scheme by and between Midei and certain Midatlantic physicians to misdirect patients away from an available non-Midatlantic treating physician whom a patient desired to have care for him—becoming aware that he could not be trusted to honestly communicate with patients, and that he and his professional association, Midatlantic, were engaged in a kickback scheme that wrongfully incentivized Midatlantic and Midei wherein they sent patients to the heart institute in return for financial benefit—indicating a willingness on Midei's part to place financial gain ahead of patients' medical interests and welfare.  Further, CHI and its agents negligently and/or intentionally breached their duties to adequately supervise and/or sanction Midei despite credible information about his lack of fitness as described in previous allegations herein, each of which have been incorporated in this count. CHI and its agents  negligently and/or intentionally breached their duties and failed to carry out their responsibilities in accordance with the level of care and skill expected of reasonably

prudent-like hospitals and health care providers under the same or similar circumstances by, among other things:

    a.    Failing to ensure adequate and independent peer review and oversight of Midei's interventional cardiac practices, especially in view of the allegations and history of having been found by a jury of engaging in fraudulent behavior in dealing with a patient and having the actual and constructive knowledge about Midei's tortious and otherwise wrongful activities, as set forth above;

    b.    Failing to investigate the growingly disproportionate and/or increasing number of stent procedures performed by Midei as compared to interventional cardiology practices at other institutions;

    c.    Failing to establish and/or enforce and/or review the criteria Midei used to determine stent placement;

    d.    Failing to intervene in the face of Midei misrepresenting the degrees of the blockages his patients had in their coronary arteries to be extensively higher than the blockages actually were;

    e.    Failing to review whether evidence existed of Midei intentionally or otherwise misrepresenting material facts to patients, such as their degree of coronary artery obstructions;

    f.    Failing to, on an ongoing basis, oversee and review whether Midei was performing medically contraindicated and unnecessary interventional cardiac procedures and/or committed further instances of fraud in the cath lab;

g.    Failing to take any steps to verify that Midei was properly interpreting cardiac catheterizations he performed in the cath lab;

h.    Failing to confirm that criteria consistent with accepted medical practices were being used to decide whether to perform interventional cardiac services;

i.    Failing to establish and/or enforce procedures to confirm that services performed by Midei, which were generating hospital revenue, were actually being performed validly;

j.    Failing to ensure that Midei obtained valid informed consent from Plaintiff and patients like him; and

k.    Failing to train and direct other Cath Lab employees and/or officers, directors, agents, servants, and/or employees to observe and report any suspicious activity by Midei.

110.    CHI's tortious conduct as set forth in this count was done deliberately, consciously, intentionally, willfully, wantonly, with actual malice and the intent to adversely impact the health and safety of the Plaintiff, and/or for the financial benefit of CHI.

111.    CHI deliberately elected not to adequately supervise, oversee, and/or discipline Midei, choosing instead to turn a "blind eye" so that CHI could reap financial benefit in the form of increased revenue and/or kickbacks for performing such procedures and/or for utilizing specific equipment to do so.

112.    As a direct and proximate result of CHI's negligent, intentional, and deficient hiring, supervision, and/or retention as alleged herein, Plaintiff suffered the injuries enumerated in this Complaint.

50

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against Catholic Health Initiatives, Inc. in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT VI – Informed Consent

113.    Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

114.    CHI and its agents owed a duty to Plaintiff to ensure that healthcare providers at SJMC would fully inform him of information that would be deemed material by a reasonable patient when deciding whether or not to undergo a particular treatment or procedure—in this case, cardiac catheterization, angioplasty, and stent placement, as well as where and by whom that procedure would be performed.  This duty required Midei to accurately inform Plaintiff of the nature of his medical problem, the nature of the proposed procedure or treatment, the probability of success of the proposed procedure or treatment, alternative procedures or treatments, the risks of the proposed procedure or treatment, and all other factors that a reasonable patient would consider material in making a decision as to a particular procedure or treatment, including but not limited to the trustworthiness of the health care providers rendering said procedures, and/or the motivating factors behind Midei's reasons for performing said procedures and/or treatment, such as financial incentive for referrals and/or procedures. Contrary to these duties, CHI failed to inform Plaintiff of the true nature of his condition, the past and ongoing fraudulent behavior by CHI, and the true intentions and/or motivations for performing the catheterization procedures.

51

115. CHI and its agents had a duty to ensure that Midei would advise Plaintiff accurately and truthfully of any suspected blockages that were seen in his artery during the cardiac catheterization procedure; the true basis upon which he would be relying in deciding to perform stenting or related procedures; that, in reality, independent of the severity of any coronary artery blockage he found, he intended to insert at least one stent and perform related procedures; the options available to Plaintiff, including but not limited to doing nothing, taking non-invasive medical steps to treat him, performing further diagnostic studies to better outline the blockages, and the types, risks, and benefits of the different kinds of stents and/or inserting a stent; and that his condition did not require a stent and all the risks attendant with stent placement and as such, did not require him to face all of the risks attendant with stent placement.

116. In violation of the duties owed to Plaintiff, CHI and its agents derogated duties that required them to ensure that cath lab health care providers, including Midei obtained valid informed consent from patients; this allowed Midei to intentionally fail to obtain appropriate informed consent from Plaintiff prior to performing angioplasty on him and inserting a stent into his LAD on July 21, 2005, in that there was a failure to disclose critical information that would have allowed a reasonable patient like Plaintiff, under circumstances similar to those he faced, to make an informed decision between medical management and surgical intervention of his condition and where and by whom he would be treated.

117. CHI's agents are vicariously liable to Plaintiff for Midei's failure to obtain his informed consent in accordance with the above. In addition, CHI and its agents had independent duties to have policies, protocols, and personnel in place to ensure that Midei and/or any other health care providers operating in their facility obtained appropriate informed consent from Plaintiff and patients like him and to enforce those policies and procedures appropriately.

Moreover, CHI had a duty to ensure that its hospital personnel were properly obtaining consent, which included the obligation to reveal to Plaintiff the information that was concealed from him, as alleged above, but failed to do so.

118.   In order to have properly informed Plaintiff, CHI and its agents should have ensured that its personnel informed him, at a minimum, of all the information they knew about Midei's and Midatlantic's, and SJMC's unethical practice of making medical decisions regarding patients that were driven by financial benefit to them and not by patient welfare; that Midei had been and continued to be engaged in a financial arrangement that improperly incentivized him to perform unnecessary stent and related procedures; that Plaintiff's coronary artery blockage was only negligible and not medically significant; that Plaintiff did not medically require angioplasty or a stent; and that, in reality, he was not even a candidate for either.  Angioplasty and stent procedures were not reasonable alternatives to address any findings relative to Plaintiff's condition and/or any complaints that Plaintiff may have had at the time or previously with the subject artery.

119.   Had Plaintiff, or any other reasonable person in his position, been informed by CHI and its agents of the information material to his deciding whether to consent to stent surgery, angioplasty, and cardiac catheterization at the hands of Midei given his aforementioned questionable practices under the same and similar circumstances as those facing him, consent would have been refused and alternate and proper forms of treatment would have been elected.

120.   The failure to obtain Plaintiff's informed consent was done deliberately, consciously, intentionally, willfully, wantonly, maliciously, with reckless disregard for his well-being, with the intent to cause him physical, emotional, and financial harm, and for the financial gain of CHI.

121.   As a direct and proximate result of CHI and its agents 's failure to ensure Midei and cath lab personnel obtained valid and meaningful informed consent was obtained for the invasive procedures that Midei and other personnel in the cath lab performed on Plaintiff, Plaintiff consented to and underwent such procedures when he otherwise would not have done so.  Indeed, the July 21, 2005 angioplasty and stent procedures were contraindicated and not medically required.  No reasonable person in Plaintiff's position would have either consented to the angioplasty and stent procedures performed by Midei, nor would any reasonable person have chosen SJMC as the facility to undergo such care.  As a further direct and proximate result of failure to obtain appropriate informed consent and/or to ensure that it was obtained, Plaintiff has suffered the injuries and harm enumerated in the previous Counts of this Complaint without any fault of his own contributing thereto.

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against Catholic Health Initiatives, Inc., in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT VII -- Negligent Entrustment

122.   Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

123.   At all times relevant hereto, CHI and its agents appointed, engaged, employed, and/or contracted with Midei to be Director of the cath lab and/or its agent, servant, and/or employee and allowed him to remain as such.

124.   At all times relevant hereto, Midei was acting within the scope and/or authority given to him by CHI and its agents.

125.   At all times relevant hereto, CHI's agents granted privileges to Midei to practice interventional cardiology in the cath lab and as Director of the cath lab.  In connection with granting Midei those privileges and/or appointing him as Director, CHI entrusted Midei with the use of CHI's medical facilities, devices, equipment, machines, and/or supplies to provide care and treatment to interventional cardiology patients, including Plaintiff.

126.   At all times relevant hereto, CHI and its agents owed a duty to Plaintiff and patients like him to use reasonable care to ensure that Midei was trustworthy, competent, and fit to safely and appropriately utilize the medical facilities, devices, equipment, machines, and/or supplies they entrusted to him.

127.   At all times relevant and, in particular, prior to the cardiovascular procedures Plaintiff underwent in the cath lab, CHI knew or had reason to know of the previously mentioned fraud scheme by and between Midei and Midatlantic to misdirect patients away from an available non-Midatlantic treating physician that a patient desired to have care for him, and was further aware of Midei's involvement in the kickback scheme that wrongfully incentivized Midatlantic and Midei to send patients to the Cath Lab in return for financial benefit.  CHI and its agents had a duty to know and knew or should have known that Midei was inflating the degrees of blockages in patient records and performing unnecessary and medically contraindicated stent procedures in light of the fact that CHI's agents, servants, and/or employees, including but not limited to physicians, nurses, technicians, and other personnel, were present when Midei was performing the stent procedures at The cath lab, and that CHI compiled data that tracked, among other things, the number of stent placements being performed

in the cath lab, the doctors performing those placements, and the disproportionate number of stent procedures being performed by Midei.

128.    With knowledge of the foregoing, as well as other information of which CHI was aware as set forth elsewhere in this claim, CHI knew or should have known that, in the course of treating Plaintiff and patients like him, Midei could not be trusted to provide care based on the patients' best medical interests, health, and welfare.   Instead, CHI was aware that Midei was motivated by an overriding financial concern for himself and his desire to enhance his professional reputation based on the prolific amount of stent procedures he performed.  Further, CHI's agents understood that Midei did not consistently conduct himself in making decisions, advising patients, and/or performing medical procedures in a way that was consistent with generally accepted applicable standards of care of an interventional cardiologist, or of any physician, for that matter.

129.    At all times relevant hereto, CHI and its agents knew or had reason to know that Midei would use the medical facilities, devices, equipment, machines, and/or supplies entrusted to him them in diagnosing and/or rendering treatment to Plaintiff and patients like him.  As such, Plaintiff was a member of a foreseeable class of persons at risk of suffering physical harm from Midei's use of the medical facilities, devices, equipment, machines, and/or supplies entrusted to him by CHI.

130.    At all times relevant hereto, CHI's agents were aware of Midei's fraudulent conduct and financial incentives for performing cardiovascular procedures in the cath lab and his disregard for the health and well-being of patients like Plaintiff.  CHI and its agents knew or had reason to know that Midei would likely use the cath lab medical facilities, devices, equipment,

machines, and/or supplies entrusted to him in a manner involving unreasonable risk of physical harm to Plaintiff and patients like him.

131.   CHI breached these duties owed to Plaintiff and others like him by entrusting Midei with the medical facilities, devices, equipment, machines, and/or supplies he used to diagnose and treat Plaintiff, and to perform the cardiac procedures which are the subject of this Complaint in light of the knowledge CHI and its agents knew or should have known about Midei.

132.   CHI negligently and intentionally breached these duties owed to Plaintiff and failed to carry out its responsibilities in accordance with the level of care and skill expected of a reasonably prudent like hospital under the same or similar circumstances by entrusting Midei with the use of medical facilities, devices, equipment, machines, and/or supplies.

133.   As a direct and proximate result of CHI's intentional and/or negligent entrustment of CHI's medical facilities, devices, machines, and/or supplies to Midei, Plaintiff suffered the injuries enumerated in this Complaint.

134.   The tortious conduct of CHI set forth in this count was engaged in deliberately, consciously, willfully, wantonly, with actual malice, with a reckless disregard for the Plaintiff's health and safety, and intent to adversely impact the health and safety of the Plaintiff and/or for the financial benefit of CHI..

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against Catholic Health Initiatives, Inc., in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT VIII – Fraud in the Inducement

135.   Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

136.   At all times material hereto, CHI and its agents, including without limitation, Midei occupied a position of trust with Plaintiff and patients like him, and had a duty to treat Plaintiff and patients like him in a truthful, honest, and fair manner.

137.   On the day of Plaintiff's cardiac catheterization procedure, CHI and its agents allowed Midei and/or other cath lab personnel to present a "Catheterization Laboratory Procedure Consent Form" (hereinafter "the Hospital Consent Form") to Plaintiff for signature. A true and authentic copy of the Hospital Consent Form is attached hereto and incorporated herein as Exhibit A. As evidenced by the Hospital Consent Form, Plaintiff and CHI's agents entered into an agreement whereby, in exchange for Plaintiff's consent to the cardiac catheterization procedure, Midei would perform heart catheterization procedure on Plaintiff to determine the "best treatment" for his condition and would "select the most appropriate procedure(s) to open the blockage" in Plaintiff's arteries. Midei further promised and represented that they would be performing the catheterization, angioplasty, and/or stent placement procedures only in the event that such procedures were medically necessary based on the Plaintiff's medical history, symptoms, and condition, and in accordance with accepted guidelines for the treatment of coronary artery blockages. CHI and its agents' above promises—to determine and select the best treatment for Plaintiff's condition and to perform an angioplasty and/or stent placement only if indicated for Plaintiff's condition and to perform an angioplasty and/or stent placement only if indicated for Plaintiff's condition—were fraudulently made in an attempt to induce Plaintiff to

consent to the cardiac catheterization and angioplasty procedures, and were made with the knowledge that Midei would not be performing the catheterization procedure to determine and select the best treatment for Plaintiff, but rather, to perform the catheterization and angioplasty procedures and place a stent in Plaintiff's arteries, regardless of whether it was the best treatment for his condition.  CHI and its agents, including Midei and other cath lab personnel, breached the duties owed to Plaintiff by making such fraudulent statements to him.

138.   By relying on the express promises regarding the purpose of the procedures and the promise to "select the most appropriate procedure(s) to open the blockage" and their further promises to perform an angioplasty and/or stent placement only if medically indicated for Plaintiff's condition, Plaintiff was in fact induced by to enter into the agreement with them, and for those reasons, he did consent to the cardiac catheterization, angioplasty, and stent procedures with a promise to pay good and valuable consideration therefor.

139.   Despite the promises made to Plaintiff, the July 21, 2005 catheterization, angioplasty, and/or stent placement procedures were not based on Plaintiff's medical history, symptoms, and condition, nor were they performed in accordance with medically accepted guidelines for the treatment of coronary artery blockages; but rather, they were medically contraindicated in that they were based on inflated degrees of blockages that Midei purposefully and fraudulently exaggerated in an effort to justify such procedures; Midei did not undertake the catheterization procedure to determine the "best treatment" available for Plaintiff—as evidenced by the fact that the best treatment for Plaintiff's condition was not given to him; and did not "select the most appropriate procedure(s) to open the blockage"—in that a stent was not medically indicated, and instead, medicinal management and/or other non-invasive treatment were more appropriate procedures for the minimal degree of blockage Plaintiff actually had.

140.   As a proximate result of the fraudulent promises made to induce Plaintiff into consenting to the procedures, Plaintiff justifiably relied on the promises and representations and consented to the procedures to his detriment, and as a result thereof, Plaintiff suffered the damages claimed previously herein.

141.   CHI's aforementioned actions were conducted deliberately and consciously, with malice, ill will, recklessness, wantonness, oppressiveness, and willful disregard for the welfare and rights of Plaintiff, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against Catholic Health Initiatives, Inc., in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT IX – Breach of Contract

142.   Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

143.   On the day of Plaintiff's cardiac catheterization procedure, CHI and its agents allowed Midei and/or other cath lab personnel to present the "Hospital Consent Form" (Exhibit A) to Plaintiff for signature.  As evidenced by the Hospital Consent Form, Plaintiff entered into an agreement with CHI and its agents, including without limitation, Midei and other cath lab personnel whereby, in exchange for Plaintiff's consent to the cardiac catheterization procedure, Midei would perform a cardiac catheterization procedure on Plaintiff to determine the "best treatment" for his condition and would "select the most appropriate procedure(s) to open the blockage" in Plaintiff's arteries.   The contract further provided that  in exchange for Plaintiff's

60

consent and promise to pay, Midei promised and represented that he would be performing the catheterization, angioplasty, and/or stent placement procedures only in the event that such procedures were medically necessary based on the Plaintiff's medical history, symptoms, and condition, and in accordance with accepted guidelines for the treatment of coronary artery blockages.

144.    In reliance on the above mentioned express promise regarding the purpose of the procedures and the promise to "select the most appropriate procedure(s) to open the blockage," and their promises to provide the best treatment for his condition, and that they would only perform angioplasty and/or stent placement procedures in the event that those procedures were medically indicated for his condition, Plaintiff was in fact induced into entering into the agreement with them, and for those reasons, he did consent to the cardiac catheterization, angioplasty, and stent procedures with a promise to pay good and valuable consideration therefor.

145.    Despite the express and/or implied promises made to Plaintiff, CHI and its agents allowed Midei and the cath lab personnel to breach their part of the agreement with Plaintiff in that the July 21, 2005 catheterization, angioplasty, and/or stent placement procedures were not based on Plaintiff's medical history, symptoms, and condition, nor were they performed in accordance with medically accepted guidelines for the treatment of coronary artery blockages; but rather, they were medically contraindicated in that they were based on inflated degrees of blockages that Midei purposefully and fraudulently exaggerated in an effort to justify such procedures. They further breached their part of the agreement in that they:

    a.      Did not determine the "best treatment" available for Plaintiff—as evidenced by the fact that the best treatment for Plaintiff's condition was not given to him; and

    b.      Did not "select the most appropriate procedure(s) to open the blockage"— in that a stent was not medically indicated, and instead, medicinal management and/or other non-invasive treatment were more appropriate procedures for the minimal degree of blockage Plaintiff actually had.

146.    As a direct and proximate result of CHI's breaches stated herein, Plaintiff suffered the damages claimed previously herein.

147.    CHI's aforementioned actions were conducted with ill will, recklessness, wantonness, oppressiveness, and willful disregard for Plaintiff's welfare and rights, and were engaged in with actual malice and intent to harm Plaintiff physically, financially, and otherwise, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff Carl Sullivan requests that judgment be entered against CHI Catholic Health Initiatives, Inc., in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

## COUNT X - Civil Conspiracy

148.    Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

149.    At all times material hereto, CHI and its agents occupied and allowed Midei to occupy a position of trust with Plaintiff and patients like him, as well as with the public in

general, to whom they held themselves and each other out as competent and trustworthy medical providers operating within the applicable standards of care. As such, they had a fiduciary duty to make health care decisions in the best interests of Plaintiff and/or patients like him and not based on their own personal and/or financial reasons, and to treat Plaintiff and patients like him honestly, fairly, and within the applicable standard of care.

150.    At all times material hereto, CHI and its agents, SJMC, Midatlantic, and Midei (hereinafter in this count referred to as "the Conspirators") were aware of the past fraudulent conduct and complaints alleged against each other relative to the misdirection of cardiac care patients to Midatlantic physicians.

151.    At all times material hereto, the Conspirators were aware and/or should have been aware of the ongoing aforementioned fraudulent, dishonest, and tortious behavior occurring in The cath lab relative to the inaccurate diagnosing, reporting, and treatment of cardiac catheterization patients like Plaintiff.

152.    At all times material hereto, the Conspirators, by agreement or understanding among each other, entered into a design to increase and/or maintain stent business in the cath lab and to grossly over-utilize, implant, and bill for the placement of stents in as many patients as possible in an effort to reap lucrative collective and independent rewards and/or favors in the form of increased revenue, salaries, and/or bonuses; enhanced professional opportunities, promotions, growth, and/or reputation; and/or procuring perks and/or incentives from the stent companies whose products the Conspirators were using.

153.    This agreement between the Conspirators breached the fiduciary relationship between them and their patients, including Plaintiff, in that it wrongly incentivized the Conspirators to perform medical procedures based on their own personal and/or financial

interests rather than making such medical decisions based on the applicable standard of care and/or best interests of Plaintiff and patients like him.

154.    In furtherance of their conspiracy, the Conspirators agreed to and did in fact negligently, intentionally, knowingly, and wrongfully appoint Midei as the director of The cath lab, and further agreed to negligently, intentionally, and wrongfully entrust Midei with the use of the cath lab facilities, including but not limited to the cath lab staff, tools, and instruments therein, despite actual and/or constructive knowledge of his past and ongoing dishonest, fraudulent, and tortious behavior within the cath lab.

155.    In furtherance of reaching the objectives of their agreement, the Conspirators consciously, deliberately, and recklessly failed to supervise Midei's activities in the cath lab by negligently, intentionally, and otherwise wrongfully granting him unfettered discretion regarding the cath lab, and further, by failing to conduct adequate peer reviews to ensure proper patient care.  Such unfettered discretion and the failure to conduct adequate peer reviews allowed Midei to grossly over-utilize stents by implanting them in Plaintiff and patients like him, and to do so in an atmosphere where Midei could cover up this tortious and fraudulent activity with little chance of outside discovery.   The Conspirators also furthered their conspiracy by deliberately, consciously, negligently, intentionally, and recklessly agreeing to and in fact doing the following:

      a.     Misrepresenting that each of them was a fit medical provider when they knew or had reason to know that was not the case;

      b.     Concealing the fraudulent activities of which each of them had been accused and/or found guilty in the past;

c.      Fraudulently inducing Plaintiff's consent to the catheterization and stenting procedures;

d.      Misrepresenting and concealing the actual degree of blockage in Plaintiff's artery to Plaintiff and/or in his health records;

e.      Negligently, intentionally, fraudulently, and recklessly placing an unnecessary and contraindicated stent in Plaintiff's artery; and

f.      Charging Plaintiff and/or third-party payors for the cost of the unnecessary procedures and stent placements.

156.    The above mentioned acts were done with the agreement or understanding that each of the Conspirators would collectively and individually benefit, financially and otherwise, from the stent placement procedures.

157.    As a direct and proximate result of the agreement or understanding between the Conspirators and the above-stated actions taken in furtherance of their agreement, Plaintiff suffered an unnecessary, painful, and dangerous cardiac stent procedures and sustained, among other things, damages which include painful and permanent injuries to his heart and body; great physical and mental pain and suffering; the need for medication that carries life threatening risks in order to maintain the unnecessarily placed cardiac stent; the risk for future stent thrombosis as well as instent restenosis; a diminished quality of life; unnecessary past and future medical expenses; and pecuniary losses past, present and future. Plaintiff's spouse, Dorothy Sullivan, has also experienced emotional and financial damages, including but not limited to mental anguish, anxiety, and a loss of consortium and services.

158.   All of Plaintiffs' injuries and damages were incurred as a direct and proximate result of the negligence of and CHI and its agents without any negligence on the part of the Plaintiffs contributing thereto.

159.   The Conspirators' aforementioned actions were conscious and deliberate wrongdoings conducted with ill will, recklessness, wantonness, oppressiveness, and willful disregard for the welfare and rights of Plaintiff, and were engaged in with actual malice and intent to harm Plaintiff physically, and both him and his spouse Dorothy Sullivan emotionally, financially, and otherwise, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiffs Carl Sullivan and Dorothy Sullivan demand more than Thirty Thousand Dollars ($30,000) in compensatory and punitive damages against Catholic Health Initiatives, Inc., for the harm detailed herein and for interest and costs of this action, plus any other compensation that may be deemed appropriate.

## COUNT XI – Loss of Consortium

160.   Plaintiffs adopt and incorporate by reference the factual allegations of the preceding and subsequent paragraphs that comprise the balance of this Complaint and re-allege them as if fully set forth herein.

161.   At all times relevant hereto, Dorothy Sullivan was and is the spouse of Carl Sullivan, and has lived and cohabitated with him in a marital relationship. As a direct and proximate result of the aforementioned negligent, intentional, and fraudulent conduct of Midei, which CHI negligently and deliberately allowed to occur, Mr. and Mrs. Sullivan, as husband and wife, have been caused to suffer and permanently suffered injury to their marital relationship, including mental anguish, emotional pain and suffering, and loss and impairment of society, advice, affection, assistance, conjugal fellowship, counsel, attention, care, services, comfort,

sexual relations, companionship, and support of one another, all to the detriment of their marital relationship.

162.    The conduct on the part of CHI, directly and/or through its individual and/or collective actual or apparent officers, directors, agents, servants, and/or employees, that caused the foregoing loss of consortium was engaged in deliberately, consciously, negligently, fraudulently, willfully, wantonly, with actual malice, and with the intent to injure Mr. and Mrs. Sullivan as husband and wife.

WHEREFORE, Plaintiffs Carl Sullivan and Dorothy Sullivan request that judgment be entered against Catholic Health Initiatives, Inc., in an amount in excess of Thirty Thousand Dollars ($30,000) in compensatory damages so as to fairly and adequately compensate Plaintiff, plus interest and costs; together with appropriate punitive damages.

Respectfully Submitted,

Howard A. Janet, Esquire
Giles H. Manley, M.D., J.D.
Joyce E. Jones, Esquire
William Burnham, Esquire
Tara J. Posner, Esquire
Janet, Jenner & Suggs, LLC
Commerce Ctr. East, Suite 165
1777 Reisterstown Road
Baltimore, MD 21208
T: (410) 653-3200
F: (410) 653-9030
*Attorneys for Plaintiffs*

## IN THE CIRCUIT COURT FOR BALTIMORE COUNTY

**CARL W. SULLIVAN**
521 Ponderosa Drive
Bel Air, MD  21014

and

**DOROTHY SULLIVAN**
521 Ponderosa Drive
Bel Air, MD  21014

       Plaintiffs

v.

**CATHOLIC HEALTH INITIATIVES, INC.**
198 Inverness Dr. West
Englewood, CO 80112

      Serve on:
      The Corporation Trust Incorporated
      351 West Camden Street
      Baltimore, Maryland  21201

      Health Care Provider

Case No. _____

RECEIVED AND FILED
2013 APR 11  P 3: 30
CLERK OF CIRCUIT COURT
BALTIMORE COUNTY

---

### ELECTION FOR JURY TRIAL

Plaintiffs Carl W. Sullivan and Dorothy Sullivan, by and through their attorneys Howard A. Janet, Giles H. Manley, M.D., J.D., Joyce E. Jones, William Burnham, Tara J. Posner, and Janet, Jenner & Suggs, LLC hereby elect to have this case tried by a jury.

*[signature appears on next page]*

Respectfully Submitted,

_____
Howard Janet, Esquire
Giles H. Manley, M.D., J.D.
Joyce E. Jones, Esquire
William Burnham, Esquire
Tara J. Posner, Esquire
Janet, Jenner & Suggs, LLC
Commerce Centre East
1777 Reisterstown Road, Suite 165
Baltimore, MD 21208
P: (410) 653-3200
F: (410) 653-9030
*Attorneys for Plaintiffs*

Served with Complaint